## COMMONWEALTH vs. MIKOLAJ K. LETKOWSKI.

No. 11-P-928.

Hampden. December 11, 2012. - July 1, 2013.

Present: KANTROWITZ, KATZMANN, & HANLON, JJ.

Further appellate review granted, 466 Mass. 1106 (2013).

*Kidnapping. Rape. Assault and Battery by Means of a Dangerous Weapon. Robbery. Intimidation of Witness. Constitutional Law,* Search and seizure, Admissions and confessions, Voluntariness of statement, Confrontation of witnesses. *Search and Seizure,* Motor vehicle. *Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement, Confrontation of witnesses, Duplicative convictions. *Evidence,* Admission by silence, Admissions and confessions, Voluntariness of statement, First complaint, Expert opinion. *Consent. Deoxyribonucleic Acid. Witness,* Expert.

A Superior Court judge properly denied a criminal defendant's motion to suppress evidence including a knife and a ski mask discovered by a police officer during a traffic stop and subsequent search of the defendant's automobile, where, together, the defendant's furtive movements, his apparent concealment of an unknown object (later revealed to be the ski mask) under his body, the match of his clothes to those described in a 911 call, and his facial injuries established a reasonable basis for the exit order and the search of the vehicle for weapons [850-851]; and where there was adequate support for the judge's finding that the defendant voluntarily surrendered the ski mask and knife to the officer [851-852].

At a criminal trial, there was no error in the admission of the defendant's post-arrest statement to police, where, after having invoked his right to remain silent and after having consented to providing a deoxyribonucleic acid sample, the defendant initiated further conversation with the police [852-853]; further, the police request for consent to search after the defendant's invocation of his right to remain silent was proper [853].

At a criminal trial, no substantial risk of a miscarriage of justice arose from the erroneous admission in evidence of references to the defendant's assertion of his right to remain silent, where, as to one reference in the testimony of a police officer, the defendant's expert witness had raised the voluntariness of his statement to police as an issue, and thus the testimony would eventually have been admitted properly; where the other references were brief in a long trial, the prosecutor did not invite speculation about the defendant's initial refusal to speak to the police or invite an inference that the silence itself was manipulative or evidence of sanity or consciousness of guilt, the prosecutor and the officer stressed that the defendant had a right not to speak with the police, and the judge gave the standard instruction given when the defendant

does not testify; and where the evidence of the defendant's guilt, including his criminal responsibility, was very strong. [853-857]

At a rape trial in which the defense was lack of criminal responsibility, there was no abuse of discretion in the admission of first complaint testimony, where the Commonwealth retained the burden of proving every element of the crimes alleged and there was no stipulation that the defendant had raped the victim, the defendant did not testify, and the defendant admitted only to larceny in his statement to the police that was admitted at trial. [857-858]

At a criminal trial, there was no error in the admission of expert opinion testimony that relied for its basis on deoxyribonucleic acid test results of a nontestifying analyst not admitted in evidence. [858]

This court concluded that a criminal defendant's convictions of aggravated kidnapping and one of his two convictions of aggravated rape were duplicative, and that his conviction of assault and battery by means of a dangerous weapon was duplicative of the other of his convictions of aggravated rape. [858-859]

INDICTMENTS found and returned in the Superior Court Department on June 8, 2006.

A pretrial motion to suppress evidence was heard by *Peter A. Velis*, J., and the cases were tried before *Daniel A. Ford*, J.

*Charles W. Rankin* for the defendant.

*Bethany C. Lynch*, Assistant District Attorney, for the Commonwealth.

HANLON, J. After a jury trial, the defendant was convicted of aggravated kidnapping, armed robbery, aggravated rape,[1] assault and battery by means of a dangerous weapon (a belt), and witness intimidation. He appeals from the denial of his motion to suppress physical evidence and a postarrest statement. He also argues that (1) his conviction should be reversed because the prosecutor improperly used his exercise of Miranda rights against him; (2) the erroneous admission of first complaint evidence created a substantial risk of a miscarriage of justice; (3) the admission of deoxyribonucleic acid (DNA) evidence violated his right of confrontation under the Sixth Amendment to the United States Constitution; and (4) some charges were "impermissibly duplicative."

---

[1] He was convicted on two indictments charging aggravated rape. On the verdict slips for both indictments the jury indicated that the verdict was based on "[a]ggravated kidnapping" and on "[a]ssault and battery by means of a dangerous weapon, a belt."

1. *Motion to suppress.* After a hearing, the motion judge, in a detailed and thoughtful memorandum, found the following facts. Early in the morning on April 18, 2006, a Springfield college student reported to the police that, on the previous evening, an attacker, wearing a black ski mask and armed with a knife, had forced her into her car in a college parking lot. She said that he had driven her to another location where he robbed and sexually assaulted her. He then drove her back to the parking lot and fled.

Later in the morning on the same day, the Longmeadow police received a 911 call reporting a suspicious person leaving a home "in a silver Chrysler PT Cruiser." Shortly afterwards, a police officer, who was aware of the 911 call, observed a car matching that description "following the car in front at an unsafe distance." The officer stopped the PT Cruiser and, as he approached, he saw that the driver, who was later identified as the defendant, "appeared to shift items within the passenger compartment." When the officer asked the defendant for his license and registration, the officer noticed that the defendant "had recent facial injuries and appeared to be sitting on an object." The officer asked the defendant to show him the object, and the defendant "produced a black ski mask." When the officer saw the ski mask, he called for assistance from other officers and asked the defendant to get out of the car. A search of the car produced "a knife with a nine-inch blade" and several empty and partially empty vodka bottles. The motion judge found that the defendant "agreed to let the officers keep the ski mask and knife that were subsequently turned over to" a Longmeadow police detective. The defendant was not arrested at that time.

On the same day, Springfield police officers recovered from the victim's car fingerprints belonging to the defendant; they showed her a photographic array that included the defendant's photograph, and she identified him as the person who "most closely resembled her attacker." The police then sought and obtained a warrant for the defendant's arrest and a search warrant for his home and the silver PT Cruiser.

The defendant was arrested the following day, taken to the Springfield police station, and advised of "his Miranda rights,

his right to counsel, and his right to a prompt arraignment." He told the police officers that he understood his rights and did not wish to waive them. He "accepted the opportunity to use the telephone to call his father." At the time of his arrest, the defendant was receiving methadone maintenance treatment from a local clinic; he had missed the dose immediately preceding his arrest. In addition, he had been taking pain medication prescribed for facial injuries resulting from an assault on April 18, 2006. The police gave him one of his prescribed pain pills "approximately one hour and ten minutes after arriving at the police station."

Within approximately fifty minutes after the pain medication was provided, after he was fingerprinted, the defendant "voluntarily provided [the investigating police officer] with a DNA sample. Shortly thereafter, [the defendant] stated that he had changed his mind about speaking to the police and now wished to give a statement." He was readvised of his Miranda rights, and this time "he signed a form indicating that he wished to speak with police." Thereafter, he gave a statement admitting to an attack on the college student.

On appeal, the defendant agrees that the stop of his PT Cruiser was lawful. See *Commonwealth* v. *Santana*, 420 Mass. 205, 207 (1995). However, he argues that his motion to suppress was wrongfully denied because the seizure of the ski mask, the order to get out of his vehicle, and the subsequent search of his car were unlawful, and, further, his postarrest statement was obtained in violation of the principles explained in *Edwards* v. *Arizona*, 451 U.S. 477 (1981).

"In reviewing the grant or denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, and accord substantial deference to the judge's ultimate findings. On a motion to suppress, the determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses, and not [the appellate] court. The clear error standard is a very limited form of review. . . . Where there has been conflicting testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted. A trial judge's ruling on a motion to suppress may be reversed where the facts found

are clearly erroneous or where justice requires [that the appellate court] substitute its judgment for that of a trial judge at the final stage." *Commonwealth* v. *Carr*, 458 Mass. 295, 298-299 (2010) (quotation and citations omitted).

2. *Evidence from the stop.* As the motion judge noted, a number of factors supported the officer's decision to remove the defendant from the car and to search it for weapons. Specifically, "Officer MacElhiney observed [the defendant's] furtive movements and apparent concealment of an unknown object under his body . . . ." In addition, the fact that the concealed object was a ski mask, and that the defendant's clothes matched those described in the 911 call, coupled with the defendant's facial injuries, established a reasonable basis for the exit order and subsequent search of the car for weapons. The defendant's attempt to isolate and discredit each factor is not persuasive.[2] See *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999) ("While a mere hunch is not enough, . . . it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order"). See also *Commonwealth* v. *Haynes*, 83 Mass. App. Ct. 903, 905 (2013) ("The officers were justified in conducting 'a *Terry*-type [*Terry* v. *Ohio*, 392 U.S. 1 (1968)] search of the vehicle's interior.' *Commonwealth* v. *Graham*, 78 Mass. App. Ct. 127, 129 [2010]").

The defendant also argues that the seizure of the black ski mask, which he calls a "hat with eye holes," was "unconstitutional" because it was not contraband and its incriminating nature was not apparent at the time the defendant was stopped. His argument that the officer improperly ordered him to "hand over his hat" misperceives the issue. In the first place, the officer properly asked the defendant what he was sitting on; the judge, who was charged with making credibility determinations, was entitled to believe the officer's testimony that, with his permission, the defendant reached under his hip and handed it to the officer, saying, "It's a hat." The judge also was entitled to credit the same officer's testimony that he "asked if [the

---

[2]For example, the defendant argues, "A hat with eye holes has lawful purposes. It may be worn skiing, among other cold-weather activities. . . . It is not inconceivable that it would be chilly in mid-April in New England."

defendant] wanted the knife and the hat back. [The defendant replied], 'No, you can keep them.' " The judge's finding that surrendering the hat and knife was voluntary is buttressed by the fact that the defendant was not arrested at that time, but permitted to leave after receiving a citation for the motor vehicle offense. The motion to suppress evidence seized at the time of the motor vehicle stop was properly denied.

3. *Defendant's statement.* The defendant next argues that the circumstances under which he gave a postarrest statement to the police violated his rights under the Fifth and Sixth Amendments to the United States Constitution as explained in *Edwards* v. *Arizona*, 451 U.S. at 484-485. Specifically, he argues that the officers' request for an oral swab after the defendant was booked (in order to obtain a DNA sample) was the functional equivalent of reinitiating interrogation after the defendant had earlier invoked his right to remain silent.

This particular argument was addressed only in passing in the defendant's pretrial memorandum, and, perhaps for that reason, was not highlighted in the judge's findings. However, it is fair to conclude from the findings as a whole that the judge found the officers' testimony to be credible. Officer Deane testified that, after the defendant said that he did not wish to speak with the officers, they took him to another part of the police station for booking, including taking photographs and fingerprints. After that process was completed, the officer approached the defendant and asked him if he would agree to provide a DNA sample. The officer explained that "he did not have to do that[,]. . . but he agreed to do so." The defendant then signed a consent form which was admitted in evidence.

Approximately ten minutes after the swab was taken, and while they were waiting for it to dry, the defendant told the officers that he wished to speak with them. They responded "that he had requested counsel, that he had refused to talk to [them] upstairs, and [they] wouldn't be able to talk to him." The defendant said that "he had changed his mind, that he wished to give his side of the story."

This case is controlled by *Commonwealth* v. *LeClair*, 445 Mass. 734 (2006), where the court reiterated the teaching of *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1045-1046 (1983), "that a

defendant, after invoking his right to counsel, may 'initiate' further conversation with the police and that if the defendant has done so, the police may properly interrogate him without violating the *Edwards* rule." *Commonwealth* v. *LeClair*, 445 Mass. at 739. For his argument that the request for DNA sample was the equivalent of reinitiating the interrogation and eliciting the defendant's statement, the defendant cites no Massachusetts or Federal authority, and the *LeClair* court made it clear that "[i]n the area of *Edwards* issues, we closely follow Federal law." *Ibid.*

In addition, a police request for consent to *search* after the invocation of Miranda rights is not considered an *Edwards* violation. See *Commonwealth* v. *Wallace*, 70 Mass. App. Ct. 757, 761 n.2 (2007), citing *Commonwealth* v. *Costa*, 65 Mass. App. Ct. 227, 233 n.8 (2005) ("The overwhelming weight of authority is that a police request for consent to search from an individual in custody is not custodial interrogation for purposes of *Miranda* v. *Arizona*, 384 U.S. 436 [1966]"). We are persuaded that as a request for a DNA sample is similar to a request to search, the same analysis should be used. Moreover, see *Commonwealth* v. *Caputo*, 439 Mass. 153, 160-161 (2003), where the court held that the police officer's request to use the defendant's telephone was not "the 'functional equivalent' of an interrogation. . . . The defendant's statement occurred only after and apparently because he had overheard the telephone conversation that tended to implicate him, not because of any 'interrogation.' "

4. *Use of defendant's silence.* For the first time, the defendant argues on appeal that the prosecutor improperly used against him his initial invocation of Miranda rights. See *Doyle* v. *Ohio*, 426 U.S. 610, 617-619 (1976), where the United States Supreme Court held that a defendant could not be cross-examined with his post Miranda warning silence, even though he offered exculpatory testimony at trial. The defendant cites three instances of what he considers "*Doyle* error[s]." The first occurred during the testimony of Officer Dean, who took the defendant's statement.[3]

---

[3]The prosecutor questioned the officer about the defendant's demeanor and the exchange between the officer and the defendant as the defendant's rights were explained:

*Q.*: "[C]an you explain to the ladies and gentlemen of the jury how you went over the Miranda warnings with him?"

There was no objection. In addition, without objection, the forms from both interview attempts entitled "Miranda Warning" and "Arraignment Warning" were admitted as exhibits.[4]

The second instance occurred in cross-examination of the defendant's expert.[5] On appeal, the defendant maintains that this was elicited over the defendant's objection; however, the objection did not come until later, when the prosecutor posed a "hypothetical[]" question, designed to explain her theory that the defendant had agreed to give his side of the story after he had been fingerprinted because he realized that there likely would be physical evidence of his presence in the victim's car.[6] Finally, the defendant's initial silence was mentioned briefly during the prosecutor's closing argument.[7] Again, there was no objection.

The issue is whether permitting any of these references, either

---

A.: "Line by line. Read question number one, and he would read before we ask him any questions. . . . Number eight is, 'Having these rights in mind, do you wish to talk to me now.' Stated he understood it, put his initials, but then wrote the word 'no,' meaning he did not wish to talk with us any further."

[4]When the documents were offered, defense counsel said, "Judge, I think those are exhibits in another facet of the case [the motion to suppress], so they [*sic*] probably should be copies made, and they should be marked separately for this so that there's . . . ." After some discussion, it was agreed that copies would be made and a trial exhibit number placed over the motion exhibit number on the copy that would be given to the jury.

[5]The prosecutor asked the expert witness: "Now, would it be fair to say that you know that, initially, the defendant did not want to speak to the police. He went through his rights and he said no, I don't want to. . . . And it was after he was fingerprinted, he then wished to speak to the police?"

The expert witness responded: "My understanding was he was willing to speak to the police so he could get his medication."

[6]The "hypothetical[]" question was, "[I]f a person realizes that they are getting fingerprinted, and they realize that they touched something that was used in the course of a crime, hypothetically, is it not reasonable to assume that a person thinks they might have my fingerprints, I'm going to tell them my side of the story." The witness responded that he thought "the issue with the fingerprints [was] really irrelevant. . . . This was a man both withdrawing from medication and also had a bad fracture of his face right around his eye, and he wasn't given his medicine. And he was told if he got his medicine, would he give a statement, and he said, 'yes.' "

[7]Specifically, the prosecutor said in closing, "What I suggest was he calculated the scenario — at first, he said he didn't want to talk to the police, which is his right. He has every right to say he did not want to talk to the

alone or in combination, to the defendant's assertion of his right to remain silent was error and, if so, whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth v. Connolly*, 454 Mass. 808, 829 (2009). On one hand, "[a] defendant's exercise of his right to remain silent or to consult counsel may not be used as substantive evidence of guilt or as evidence negating a claim of insanity." *Commonwealth v. Toolan*, 460 Mass. 452, 470 (2011). On the other hand, as the *Toolan* court observed, "[m]ention of Miranda warnings is not . . . forbidden at trial: under the Commonwealth's 'humane practice' rule, where the voluntariness of a statement is a live issue at trial, the jury may hear evidence that a defendant was informed of and understood his Miranda rights." *Id.* at 471.

In this case, the defendant does not dispute that voluntariness was a live issue at the trial and the judge gave a detailed and thorough humane practice instruction in his charge to the jury. The fact that the defendant was twice advised of his rights and indicated in writing that he understood them surely is relevant on that issue. On balance, we are persuaded that, in order to establish the voluntariness of the later waiver and statement, the detective's testimony that the defendant initially invoked his rights after they had been explained to him would properly have been admitted to show that the defendant understood his rights and knew, despite his mental state, his pain, and his heroin addiction, that he could refuse to speak to the officers. Similar testimony has been deemed admissible to prevent jury confusion when an interview was terminated abruptly, *Commonwealth v. Habarek*, 402 Mass 105, 109-110 (1988), and in the present case, there was possible confusion about why there were two encounters between the defendant and the police. Compare *ibid.*

However, the defendant is correct that the evidence did not

police and that should not be taken against him. But then he finishes the booking process. What does that involve? They are rolling his fingerprints, and he's thinking to himself as they are rolling finger by finger by finger by finger, damn, damn. I drove that girl's car. I touched the steering wheel. Okay. I want to talk to the cops. I want to tell my side of the story." The prosecutor went on to describe the defendant's version of what had occurred as largely exculpatory, saying, "So what does he tell them? Yeah, I forced her into her car — I didn't have a knife, no armed robbery — and made her give me some money, and I took her name and address so I was going to pay her back, and I never sexually assaulted her."

become relevant until he raised the issue whether his statement had been given voluntarily. See *Commonwealth* v. *Toolan*, 460 Mass. at 472-473 ("[U]nless the defendant opens the door, it is not proper for the Commonwealth to elicit testimony referencing the defendant's deliberations over whether to exercise his Miranda rights . . . or his decision to contact an attorney and efforts to do so"). See also *Commonwealth* v. *Caputo*, 439 Mass. at 165. In addition, we agree that the prosecutor's reference to the defendant's silence in her question to the defendant's expert and, particularly, her reiteration of the point in her closing argument came dangerously close to using the defendant's initial silence against him and should not have been said. In neither case was the allusion to the defendant's initial silence necessary to argue the rationality and voluntariness of his later, largely exculpatory statement.

"Introducing evidence of a suspect's invocation of his right to remain silent is a serious error that may result in reversal of a conviction. . . . We inquire whether the evidence created a substantial risk of a miscarriage of justice . . . by considering five factors: '(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or the quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions.' " *Commonwealth* v. *Connolly*, 454 Mass. 808, 829 (2009), quoting from *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983).

Here, we have in mind that the defendant, with testimony from his expert, did raise the voluntariness of his statement as an issue, albeit later in the trial, so that at least the detective's testimony eventually would have been admitted properly. The other references were brief in a long trial, and at no time did the prosecutor invite speculation about why the defendant initially had refused to speak to the officers; nor did she invite an inference that the silence itself was manipulative or evidence of sanity or consciousness of guilt. In addition, both the prosecutor and the officer stressed that the defendant had a right not to speak with the police, and the judge also gave the jury the standard instruction given when the defendant does not testify.[8]

---

[8]"Under our system of law, a defendant in a criminal case has a perfect

Also, there was no objection from defense counsel to any of the references in this vigorously litigated case. Finally, the evidence of the defendant's guilt, including his criminal responsibility, was very strong. We are satisfied that there was no substantial risk of a miscarriage of justice.

We touch briefly on the defendant's remaining arguments.

5. *First complaint.* First complaint testimony was admitted without objection. The defendant argues this created a substantial risk of a miscarriage of justice because his defense at trial was lack of criminal responsibility. In *Commonwealth* v. *King,* 445 Mass. 217, 247 (2005), the Supreme Judicial Court observed that, "where neither the occurrence of a sexual assault nor the complainant's consent is at issue, the evidence will serve no corroborative purpose and will not be admissible under the first complaint doctrine." It is true that, in this case, defense counsel told the jury in his opening statement that the only issue was the defendant's criminal responsibility.[9] Nonetheless, the Commonwealth retained the burden of proving every element of the crimes alleged and there was no stipulation that the defendant had raped the victim by penetrating her digitally or forcing her to perform oral sex. In fact, defense counsel never explicitly conceded that a sexual assault had taken place. More importantly, the defendant did not testify, and, in his statement to the police, which was admitted in evidence with a video recording shown to the jury, he admitted only to larceny. In the statement he specifically denied using a knife or beating the victim with a belt or sexually assaulting her.[10] Under all of the circumstances, we see no abuse of discretion in the admission of first complaint

right to say to the Commonwealth, you have the burden of proving your case against me beyond a reasonable doubt, and I don't have to say a single word."

[9]Specifically, he said, "I know you listened intently to [the prosecutor] describe a series of events that happened to a young woman . . . . I'm not going to stand here and suggest to you that that didn't happen to her. If that were the only issue in this case, you wouldn't need to be here. The issue in this case is not what happened to [the victim]. The issue in this case is whether or not, when my client did those things, he was criminally responsible . . . ."

[10]"At no time did I ever threaten the girl with the butcher knife. . . . Det. Dean asked me if I made the girl drive over to some apartments in Agawam and to a wooded area and if I sexually assaulted the girl. I told them no. I never put my hands on her. I never beat her. I never took off my belt or took out my dog's leash and collar."

testimony in this case. See *Commonwealth* v. *Aviles*, 461 Mass. 60, 73 (2011).

6. *DNA testimony.* A forensic DNA analyst from the State crime laboratory testified without objection that she compared "the known saliva standard from [the defendant] and the results of the . . . analysis on the vaginal swabs [from the victim] in this case" and found that it matched. On appeal, for the first time, the defendant argues "that the admission of [the analyst's] DNA testimony and charts violated [the defendant's] confrontation rights," because the witness's opinion "rested upon the accuracy and veracity of the unknown analyst's work on [the defendant's] sample and there is no indication from the record that [the analyst] observed the testing, reviewed the data, or was familiar with the unknown analyst's typical practices." After the present case was argued, the Supreme Judicial Court rejected that argument in *Commonwealth* v. *Greineder*, 464 Mass. 580, 603 (2013) ("Expert opinion testimony, even that which relies for its basis on the DNA test results of a nontestifying analyst not admitted in evidence, does not violate a criminal defendant's right to confront witnesses against him under either the Sixth Amendment or art. 12 of the Massachusetts Declaration of Rights"). There was no error.

7. *Duplicative charges.* Finally, the Commonwealth agrees with the defendant that, in the circumstances of this case, "the aggravated kidnapping and one of the aggravated rape convictions were duplicative and, therefore one must be vacated." Also, the Commonwealth agrees that "the assault and battery by means of a dangerous weapon (belt) conviction was duplicative of the defendant's second aggravated rape conviction, since it was one of the aggravating factors under G. L. c. 265, § 22(*a*)." We agree that the conviction of aggravated kidnapping and one of the convictions of aggravated rape are duplicative and that the conviction of assault and battery by means of a dangerous weapon is duplicative of one of the convictions of aggravated rape.

Accordingly, on the indictments charging armed robbery and witness intimidation, the judgments are affirmed. On the indictment charging assault and battery by means of a dangerous weapon, the judgment is vacated, the verdict is set aside, and the indictment is dismissed. The indictments charging aggravated

kidnapping and aggravated rape are remanded to the Superior Court to permit the trial judge, after hearing arguments of both parties, to determine which indictment to dismiss as duplicative, having in mind the offenses charged in the indictments and the respective punishments, and considering which he considers more appropriate to dismiss. See *Commonwealth* v. *Johnson*, 75 Mass. App. Ct. 903, 906 (2009). For the indictment that will be dismissed as duplicative, the judge shall cause the entry to be made on the docket, "The judgment is vacated, the verdict is set aside, and the indictment is dismissed." For each of the two indictments that are not dismissed, the entry shall be made on the docket, "Judgment affirmed."

*So ordered.*